# United States Court of Appeals
## For the First Circuit

No. 06-1775

MARY T. JEAN,

Plaintiff, Appellee,

v.

MASSACHUSETTS STATE POLICE, et al.,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor IV, U.S. District Judge]

Before

Boudin, Chief Judge,
Campbell, Senior Circuit Judge,
and Lipez, Circuit Judge.

Ronald F. Kehoe, Assistant Attorney General, with whom Thomas F. Reilly, Attorney General, was on brief, for appellants.
Eric B. Hermanson, with whom Sara E. Solfanelli, Choate, Hall & Stewart LLP, John Reinstein, and American Civil Liberties Union of Massachusetts were on brief, for appellee.

June 22, 2007

**LIPEZ, Circuit Judge.** This case presents the question of whether the First Amendment prevents Massachusetts law enforcement officials from interfering with an individual's internet posting of an audio and video recording of an arrest and warrantless search of a private residence, when the individual who posted the recording had reason to know at the time she accepted the recording that it was illegally recorded. The appellant state police officers challenge the district court's grant of a preliminary injunction enjoining them from taking any action that interferes with appellee Mary Jean's posting of the recording on a website. We find this case materially indistinguishable from the Supreme Court's decision in Bartnicki v. Vopper, 532 U.S. 514 (2001), and thus conclude that Jean has a reasonable likelihood of success on the merits of her claim that the First Amendment protects the posting of a recording under such circumstances. Consequently, we uphold the preliminary injunction.

**I.**

**A. Factual Background**

The facts are largely undisputed; where disputes exist, they do not affect the outcome of this appeal.

Jean, a local political activist in Worcester, Massachusetts, maintained a website displaying articles and other information critical of former Worcester County District Attorney

-2-

John Conte.[1]  In October 2005, Paul Pechonis contacted Jean through her website.  They had never met previously.  Pechonis explained that, on September 29, eight armed State Police troopers arrested him in his home on a misdemeanor charge.  He met the officers at the front door and allowed them to handcuff him.  The officers then conducted a warrantless search of his entire house.  The arrest was both audiotaped and videotaped by a "nanny-cam," a motion-activated camera used by parents to monitor children's activities within the home.  The parties contest whether the recording was accidental; this fact is immaterial to the outcome of the case.

Pechonis provided Jean a copy of the audio/video recording.  We assume, for purposes of this appeal, that when Jean accepted the tape she had reason to know that it had been illegally recorded.  On January 29, 2006, Jean posted the recording on her website accompanied by an editorial comment critical of Conte's performance in office.

By letter dated February 14, the State Police advised Jean that her actions violated Mass. Gen. Laws ch. 272, § 99 ("section 99"), and were subject to prosecution as a felony.[2]  The

---

[1] The website is accessible at www.conte2006.com.  Conte is no longer in office.

[2] Mass. Gen. Laws ch. 272 § 99(B)(4) defines an "interception" as "to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication."  In pertinent part, Mass. Gen. Laws ch. 272

letter stated that, if Jean did not "cease and desist, within 48 hours of receipt of this letter, from posting this unlawful tape on the internet or any other publicly accessible site," the police would "refer this matter to the District Attorney's office for further investigation and possible prosecution." The police sent a second letter on March 29, which clarified the previous letter by stating that, given the statute's limitation to "wire or oral communications," Jean would not be in violation if she removed the audio portion of the recording from her website.

## B. Procedural History

On February 17, 2006, Jean filed a complaint in federal district court in Massachusetts seeking a temporary restraining order and preliminary and permanent injunctive relief against the Massachusetts State Police, State Police Superintendent Thomas G. Robbins, and Attorney General Thomas Reilly in their individual and official capacities (collectively, "the police").[3] Citing her

---

§ 99(C)(1) states that any person who "willfully commits an interception, attempts to commit an interception, or procures any other person to commit an interception" may be punished with a fine of up to ten thousand dollars, imprisoned for up to five years, or both. Section 99(C)(3) states that an individual who "willfully discloses or attempts to disclose to any person the contents of any wire or oral communication, knowing that the information was obtained through interception . . . shall be guilty of a misdemeanor." Finally, section 99(C)(6) prohibits "permit[ting]," "participat[ing] in a conspiracy to commit," or serving as an "accessory" to other violations of section 99.

[3] Since the time Jean filed her complaint, Reilly has been succeeded as Massachusetts Attorney General by Martha Coakley. Under Federal Rule of Civil Procedure 25, however, "the action does

right to free speech under the First Amendment, Jean sought to preclude defendants from threatening her with prosecution or enforcing section 99 against her.  The district court granted a temporary restraining order preventing the police from interfering with Jean's "disclosure, use, or display, including posting on the internet," of the audio/video recording.

After briefing and a hearing, the court granted the request for a preliminary injunction on April 7.  Finding the case controlled by Bartnicki v. Vopper, 532 U.S. 514 (2001), the court noted that Jean played no part in the recording of the video, that she had "obtained the tape lawfully," and that the videotape related to a "matter of public concern."  The court concluded that Jean had demonstrated a likelihood of success on the merits of her First Amendment claim, that irreparable harm would result from the absence of an injunction, and that the balance of burdens and public interests weighed in favor of Jean.  Consequently, it granted the preliminary injunction.  This appeal ensued.

## II.

### A. Standard of Review

Under 28 U.S.C. § 1292(a)(1), we have jurisdiction to hear an interlocutory appeal of an order granting a preliminary injunction.  We review the grant or denial of a preliminary

---

not abate and the officer's successor is automatically substituted as a party."  Fed. R. Civ. P. 25(d)(1).

injunction for abuse of discretion. Wine & Spirits Retailers, Inc. v. Rhode Island, 418 F.3d 36, 46 (1st Cir. 2005). Within that framework, "findings of fact are reviewed for clear error and issues of law are reviewed de novo." Id. Thus, "we will set aside a district court's ruling on a preliminary injunction motion only if the court clearly erred in assessing the facts, misapprehended the applicable legal principles, or otherwise is shown to have abused its discretion." Id.

In considering the motion for a preliminary injunction, a district court weighs four factors: (1) the plaintiff's likelihood of success on the merits; (2) the potential for irreparable harm in the absence of an injunction; (3) whether issuing an injunction will burden the defendants less than denying an injunction would burden the plaintiffs; and (4) the effect, if any, on the public interest. Bl(a)ck Tea Soc'y v. City of Boston, 378 F.3d 8, 11 (1st Cir. 2004). The police contest only the first factor: Jean's likelihood of success on the merits. That inquiry is the most important part of the preliminary injunction assessment: "[I]f the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002). Moreover, to the extent that the police could have argued that the other three factors assist in demonstrating abuse of discretion by the district

court, they have now waived those arguments by failing to raise them on appeal.

Thus, the question before us is whether the district court erred in granting a preliminary injunction prohibiting the enforcement of Mass. Gen. Laws ch. 272, § 99 against Jean for her receipt and internet posting of the audio/video recording of Pechonis' arrest. Like the district court, we evaluate whether, in light of the record before us, she has a reasonable likelihood of success on the merits.

**B. Bartnicki v. Vopper**

We agree with the district court that this case is controlled by the Supreme Court's decision in Bartnicki v. Vopper, 532 U.S. 514 (2001). Therefore, we must examine that decision closely before applying it to the facts of this case.

1. Background

In Bartnicki, the Supreme Court considered "what degree of protection, if any, the First Amendment provides to speech that discloses the contents of an illegally intercepted communication." Id. at 517. The dispute in Bartnicki arose during contentious collective bargaining negotiations between a Pennsylvania school board and a union representing teachers at the local high school. An unidentified person intercepted and recorded a cellular phone call between the union's chief negotiator and the president of the local union, during which the president stated: "If they're not

gonna move for three percent, we're gonna have to go to their, their homes . . . . To blow off their front porches . . . ." Id. at 518-19 (first omission in original)(internal quotation marks omitted).

Jack Yocum, the head of a local taxpayer's organization, subsequently found a recording of the intercepted conversation in his mailbox. He played the tape for members of the school board and later delivered the tape to Frederick Vopper, a radio commentator, who played the tape on his public affairs talk show. The union officials brought an action for damages under federal and state wiretap statutes against Yocum and Vopper, who invoked their First Amendment right to speak on issues of public importance.

The relevant provision of the federal wiretap statute, 18 U.S.C. § 2511(1)(c), provides that any person who "intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral or electronic communication in violation of this subsection" may be sued. The Pennsylvania state wiretap statute contains a similar provision. 18 Pa. Cons. Stat. § 5703. Both statutory schemes also provide for recovery of damages for violations. 18 U.S.C. § 2520(c)(2); 18 Pa. Cons. Stat. § 5725(a).

Following discovery, the parties filed cross-motions for summary judgment before the district court. The court denied both motions and granted a motion for an interlocutory appeal to the Third Circuit. That court concluded that the statutes were invalid as applied because they deterred significantly more speech than was necessary to protect the privacy interests at stake, and remanded with instructions to enter summary judgment for defendants. Bartnicki, 532 U.S. at 521-22 (citing Bartnicki v. Vopper, 200 F.3d 109, 121 (3d Cir. 1999)). The Supreme Court then granted certiorari to determine whether the First Amendment shielded defendants from suits for damages for violation of § 2511(1)(c) and its Pennsylvania analog.

Since the grant of certiorari followed a remand with instructions to enter summary judgment for defendants, the majority opinion (authored by Justice Stevens and joined by five other Justices) viewed the facts in the light most favorable to the plaintiffs. Bartnicki, 532 U.S. at 525. It assumed "that the interception was intentional, and therefore unlawful, and that, at a minimum, [defendants] 'had reason to know' that it was unlawful." Id. at 525. The plaintiffs were thus entitled to recover damages under the statutes unless application of the statutes in such circumstances would violate the First Amendment. Id. The Court also accepted three other factual propositions "that serve to distinguish most of the cases that have arisen under § 2511."

First, the defendants "played no part in the illegal interception. Rather, they found out about the interception only after it occurred, and in fact never learned the identity of the person or persons who made the interception." Second, defendants' "access to the information on the tapes was obtained lawfully, even though the information itself was intercepted unlawfully by someone else." Third, "the subject matter of the conversation was a matter of public concern." Id.

2. The Supreme Court's Analysis

The Court first held that § 2511(1)(c) was content neutral, explaining that the statute "does not distinguish based on the content of the intercepted conversations, nor is it justified by reference to the content of those conversations. Rather, the communications at issue are singled out by virtue of the fact that they were illegally intercepted . . . ." Id. at 526. The Court also explained that the statute, as applied to the facts of the case, "is fairly characterized as a regulation of pure speech." Id. It noted that the delivery of a tape recording "is like the delivery of a handbill or pamphlet, and as such, it is the kind of 'speech' that the First Amendment protects." Id. at 527.

Having established these principles, the Court then balanced the state interests served by the statute against the public interest in the disclosure of information. The Court identified two interests served by the statute: (1) "removing an

incentive for parties to intercept private conversations"; and (2) "minimizing the harm to persons whose conversations have been illegally intercepted." Id. at 529. The Court accorded little weight to the first interest, id. at 532, noting that "it would be quite remarkable to hold that speech by a law-abiding possessor of information can be suppressed in order to deter conduct by a non-law-abiding third party," id. at 529-30, and explaining that "there is no empirical evidence to support the assumption that the prohibition against disclosures reduces the number of illegal interceptions," id. at 530-31. It found the second interest in the situation before it more immediately relevant, noting that "disclosure of the contents of a private conversation can be an even greater intrusion on privacy than the interception itself." Id. at 533. Given this concern, it found a "valid independent justification" for prohibiting "disclosures by persons who lawfully obtained access to the contents of an illegally intercepted message," even if such prohibition does not deter the initial interception. Id. In particular, "the fear of public disclosure of private conversations might well have a chilling effect on private speech." Id.

With respect to the public interest in disclosure, the Court emphasized that "'if a newspaper lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the

information, absent a need . . . of the highest order.'"  Id. at 528 (quoting Smith v. Daily Mail Publ'g Co., 443 U.S. 97, 103 (1979)(omission in original)).  Given the presumption in favor of protecting publication of truthful information, the issue presented in Bartnicki was narrow: "'Where the punished publisher of information has obtained the information in question in a manner lawful in itself but from a source who has obtained it unlawfully, may the government punish the ensuing publication of that information based on the defect in a chain?'"  Id.  (quoting Boehner v. McDermott, 191 F.3d 463, 484-85 (D.C. Cir. 1999)(Sentelle, J., dissenting)).

Although the Court thus noted that "there are important interests to be considered on both sides of the constitutional calculus," id. at 533, it ultimately concluded that "privacy concerns give way when balanced against the interest in publishing matters of public importance," id. at 534.  Surveying the many cases in which it had protected speech on matters of public concern, id. at 534-35, the Court explained that "[o]ne of the costs associated with participation in public affairs is an attendant loss of privacy," id. at 534.  Consequently, the Court concluded that "a stranger's illegal conduct does not suffice to remove the First Amendment shield from speech about a matter of public concern."  Id. at 535.  Because the collective bargaining negotiations in Bartnicki were "unquestionably a matter of public

concern, and respondents were clearly engaged in debate about that concern," the First Amendment prohibited recovery of damages against defendants.  Id.

## C. Application of Bartnicki to Jean's Circumstances

As a preliminary matter, we note that, like the statutes in question in Bartnicki, section 99 is a "content-neutral law of general applicability," id. at 526.  It "does not distinguish based on the content of the intercepted conversations, nor is it justified by reference to the content of those conversations."  Id.  Like the delivery of the recording in Bartnicki, which the Court analogized to "the delivery of a handbill or a pamphlet," id. at 527, section 99's prohibition against disclosure also constitutes a regulation of "pure speech."

As did the Court in Bartnicki, we consider the interests implicated by the disclosure of the information.  With respect to the state's interest in protecting the privacy of its citizens, the privacy interests discussed in Bartnicki are less compelling here. Bartnicki emphasized the importance of "encouraging the uninhibited exchange of ideas and information among private parties," id. at 532, and of avoiding the "'[f]ear or suspicion that one's speech is being monitored by a stranger,'" id. at 533 (quoting President's Commission on Law Enforcement and Administration of Justice, The Challenge of Crime in a Free Society 202 (1967)).  This interest in protecting private communication is clearly implicated by the

interception of a private cell phone conversation in Bartnicki. However, this interest is virtually irrelevant here, where the intercepted communications involve a search by police officers of a private citizen's home in front of that individual, his wife, other members of the family, and at least eight law enforcement officers.

Moreover, the state's interest in deterring illegal interception by punishing a subsequent publisher of information — already accorded little weight by the Court in Bartnicki — receives even less weight here, where the identity of the interceptor is known. In Bartnicki, the government argued that punishing a subsequent publisher of information "remov[es] an incentive for parties to intercept private conversations" by deterring would-be publishers of illegally intercepted material and thus reducing the demand for such material. Id. at 529-30 & n.17. This argument rested, in part, on the assumption that the interceptors themselves could not be punished because their identities usually were unknown. Unimpressed, the Court explained that the available evidence did not support this assumption of anonymity. First, the legislative record did not indicate that a significant number of interceptors were anonymous. Id. at 531 n.17. Moreover, fewer than ten of the 206 cases filed under § 2511 (the federal wiretap statute) involved an anonymous interceptor. Id. Thus, the Court concluded that the relatively small number of anonymous

interceptors meant that it was not "difficult to identify the persons responsible for illegal interceptions" and, consequently, not "necessary to prohibit disclosure by third parties with no connection to, or responsibility for, the initial illegality," id.

Given this logic, there is a better argument for prosecuting a subsequent publisher of information when the interceptor is anonymous. In such a situation, the government is unable to punish the interceptor directly; punishing the subsequent publisher might be more justifiable as a deterrent. However, even after taking into account the anonymity of the interceptor in Bartnicki, the Court held that "[a]lthough there are some rare occasions in which a law suppressing one party's speech may be justified by an interest in deterring criminal conduct by another, this is not such a case." Id. at 530 (citation omitted). Thus, where, as here, the identity of the interceptor is known, there is even less justification for punishing a subsequent publisher than there was in Bartnicki.

On the public interest side of the equation, the broad interest in permitting "the publication of truthful information of public concern," described in Bartnicki, id. at 534-35, applies here as well. The police do not deny that the event depicted on the recording — a warrantless and potentially unlawful search of a private residence — is a matter of public concern. The police also concede that, like the defendants in Bartnicki, Jean played no part

-15-

in the illegal interception. Thus, the only possible ground for distinguishing this case from Bartnicki is the assertion of the police that Jean, unlike the defendants in Bartnicki, did not obtain the recording lawfully.

The Massachusetts interception statute prohibits "willfully commit[ting] an interception," Mass. Gen. Laws ch. 272, § 99(C)(1), and "willfully disclos[ing] . . . the contents of any wire or oral communication, knowing that the information was obtained through interception," id. § 99(C)(3). It likewise forbids "permit[ting]," "participat[ing] in a conspiracy to commit," or acting as an "accessory to a person who commits" a violation of another subsection of the statute. Id. § 99(C)(6). By willfully recording his arrest and then giving the recording to Jean, Pechonis arguably would have violated both section 99(C)(1) and section 99(C)(3). Thus, the police argue, by voluntarily accepting the tape from Pechonis and then disseminating it, Jean assisted, conspired, or served as an accessory to Pechonis' violation of section 99(C)(3) and thereby independently violated section 99(C)(6).

Elaborating on this point, the police contend that "the disseminator's knowledge, when she obtains the tape, of the interceptor's identity and of the unlawfulness of the interception is determinative of whether she has obtained it lawfully or unlawfully for purposes of a Bartnicki analysis." They emphasize

that, in Bartnicki, the tape was placed anonymously in Yocum's mailbox, and Yocum received the tape without knowing its contents until after he played it. 532 U.S. at 519. Thus, they argue, "[t]he break in the chain between the interceptor and the defendants became the pivotal point in the Court's balancing of interests because the break meant that the defendants had not obtained the tape unlawfully." In contrast, "Jean knowingly participated in [Pechonis'] disclosure and became the essential but-for first link in the chain." In short, appellants insist that the "essential distinction between this case and Bartnicki" was that "[i]n Bartnicki, the interceptor had already disseminated the tape before Yocum passively received it and disseminated it further; . . . . In the present case, it was Jean's active collaboration with Pechonis that made his unlawful dissemination possible in the first instance."

We will assume that Jean's conduct, viewed through the prism of section 99(C)(3) and section 99(C)(6), may have been unlawful under the Massachusetts statute. She disclosed to others the contents of an oral communication that she knew had been recorded illegally, and she arguably participated with Pechonis in a conspiracy to disclose the content of the illegally recorded oral communication. However, whether Jean's conduct fell within the statute is not determinative — indeed, we note that the conduct of both Yocum and Vopper in Bartnicki would have fallen within this

-17-

statute. Rather, the determinative question is whether the First Amendment, as applied by the Supreme Court in Bartnicki, permits Massachusetts to criminalize Jean's conduct. On this question, we find the arguments of the police unpersuasive.

The police note correctly that, in Bartnicki, Yocum did not realize that the tape had been recorded illegally at the time he received it in his mailbox. Yocum's knowledge of the illegality of the interception arose only later, when he listened to the tape. Although the police argue that this delay between the receipt of the tape and the recognition of its illegality caused a critical break in the chain, the Supreme Court attached no significance to Yocum's receipt of the tape without knowledge of its contents. If the disconnect in time between the receipt of the tape and the later recognition that the tape had been recorded illegally was critical to the premise that Yocum had obtained the tape lawfully, the Court would have distinguished between Yocum and Vopper, who received the tape directly from Yocum and thus knew the tape had been recorded illegally at the time that he received it. Id. at 519. Yet the Court explicitly stated that it found no distinction between Yocum and Vopper. Id. at 525 n.8. Like Vopper, Jean already had reason to know that the tape was illegally intercepted at the time that she received it; consequently, the Court's conclusion that Vopper obtained the tape lawfully applies equally to Jean.

The police still insist on a distinction between Jean and the defendants in Bartnicki because Jean's "active collaboration" with Pechonis as the essential "first link" in the chain of dissemination distinguishes this case from Bartnicki. They contend that Jean "had the opportunity to prevent the dissemination" and that "no one farther down the chain would have the same opportunity." We also find this distinction unpersuasive. Critically, in Bartnicki, Yocum had the opportunity to prevent further disclosure. Although he did not know the tape was illegally intercepted when he received it, he had that knowledge at the time he disclosed the tape to the school board and Vopper. Thus, both Yocum and Jean could have prevented further dissemination by refusing to disclose the tape. In light of this similarity, the fact that Yocum received the tape "passively" and Jean received the tape "actively" is a distinction without a difference: both made the decision to proceed with their disclosures knowing that the tape was illegally intercepted, yet the Supreme Court held in Bartnicki that such a knowing disclosure is protected by the First Amendment.

Our conclusion is further supported by the D.C. Circuit's recent decision in Boehner v. McDermott, 2007 WL 1246438 (D.C. Cir. May 1, 2007)(en banc). In Boehner, Alice and John Martin illegally intercepted a cell phone conversation between Representative John Boehner and several House Republican leaders. The Martins

delivered a tape of the conversation, accompanied by a typed letter explaining the nature of its contents, to the office of Representative James McDermott, the ranking Democrat on the House Ethics Committee, who, "[a]fter conversing with the Martins, . . . accepted the envelope." Id. at *2. McDermott listened to the tape that evening and disclosed it to various newspapers the following day. Boehner subsequently filed a complaint against McDermott seeking damages for violations of federal and state wiretapping statutes.

Following a lengthy procedural history,[4] the D.C. Circuit heard the case en banc. The majority held that "Representative McDermott's position on the Ethics Committee imposed a 'special' duty on him not to disclose the tape in these circumstances," id. at *5, and thus he "had no First Amendment right to disclose the tape to the media," id. at *7. The majority explicitly distinguished Bartnicki, explaining that the case "has little to say about" McDermott's special duty because "[t]he individuals who disclosed the tape in [Bartnicki] were private citizens who did not occupy positions of trust." Id. at *5. Importantly, however, "a majority of the members of the Court . . . would have found [McDermott's] actions protected by the First Amendment" if he were not subject to a special duty as a member of the Ethics Committee. Id. at *7 (Griffith, J., concurring); see also id. at *12

_____

[4] See Boehner, 2007 WL 1246438 at *1, for an account of this history.

-20-

(Sentelle, J., dissenting).[5] In other words, if McDermott had been a private citizen, like Jean, the court would have concluded that his disclosure of the tape was subject to First Amendment protection regardless of the fact that he received the tape directly from the Martins and thus served as the "first link" in the chain leading to publication.

Returning to Bartnicki, the police make a final attempt to distinguish the instant case by contending that language in Justice Breyer's concurring opinion, joined by Justice O'Connor, differentiates that case from the situation at hand. They cite the concurrence's statement that "[n]o one claims that [defendants] ordered, counseled, encouraged, or otherwise aided or abetted the interception, the later delivery of the tape by the interceptor to an intermediary, or the tape's still later delivery by the intermediary to the media," Bartnicki, 532 U.S. at 538 (Breyer, J., concurring)(emphasis added). The precise scope of the emphasized language is uncertain, and the police argue that Jean's knowing acceptance of the tape constitutes aiding and abetting its delivery to an intermediary in the person of Jean herself. Ultimately, however, this language does not help the police. The concurrence also states plainly that "the statutes do not forbid the receipt of

---

[5] Judge Griffith joined the majority opinion but concurred to state explicitly that McDermott's publication would have been protected if he were not a member of the Ethics Committee. The dissent would have found McDermott's publication protected by the First Amendment regardless of his position on the Ethics Committee.

-21-

the tape itself," id. at 538. This statement indicates that Justice Breyer did not interpret 18 U.S.C. § 2511(c), in conjunction with the federal aiding and abetting statute, 18 U.S.C. § 2, to punish an individual's acceptance of a tape, even if that individual had reason to know that the tape's contents were illegally intercepted. Moreover, if he had interpreted the statute to forbid later disclosure of the tape by one who had lawfully received it, he could not have joined the majority opinion, which held that the defendants, who certainly aided the tape's later delivery by an intermediary to the media, did nothing unlawful. Thus, the concurring opinion offers no basis for distinguishing Jean's situation from that of the defendants in Bartnicki.

## III.

We conclude that the government interests in preserving privacy and deterring illegal interceptions are less compelling in this case than in Bartnicki, and Jean's circumstances are otherwise materially indistinguishable from those of the defendants in Bartnicki, whose publication of an illegally intercepted tape was protected by the First Amendment. Jean's publication of the recording on her website is thus entitled to the same First Amendment protection. Consequently, we agree with the district court that Jean has a reasonable likelihood of success on the merits of her suit for a permanent injunction. The district

-22-

court's decision to grant Jean's request for a preliminary injunction is affirmed.

**So ordered.**