# United States Court of Appeals
## For the First Circuit

No. 19-2292

UNITED STATES,

Appellee,

v.

BRIAN BILODEAU,

Defendant, Appellant.

No. 20-1034

UNITED STATES,

Appellee,

v.

MR, LLC,

Defendant, Appellant.

No. 20-1054

UNITED STATES,

Appellee,

v.

TYLER POLAND; TY CONSTRUCTION, LLC; TY PROPERTIES, LLC,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Kayatta, Barron, Circuit Judges,
and O'Toole,[*] District Judge.

Jamesa J. Drake, with whom Drake Law LLC, Timothy E. Zerillo, and Zerillo Law Firm, LLC were on brief, for appellant Brian Bilodeau.
Alfred C. Frawley, IV, with whom Thimi R. Mina and McCloskey, Mina, Cunniff & Frawley, LLC were on brief, for appellant MR, LLC.
Thomas F. Hallett, with whom Benjamin N. Donahue and Hallett Whipple Weyrens were on brief, for appellants Tyler Poland, Ty Construction, LLC, and Ty Properties, LLC.
Professor Scott Bloomberg, amicus curiae.
Benjamin M. Block, Assistant United States Attorney, with whom Halsey B. Frank, United States Attorney, was on brief, for appellee.

January 26, 2022

[*] Of the District of Massachusetts, sitting by designation.

**KAYATTA**, **Circuit Judge**. This interlocutory appeal requires us to consider whether and under what circumstances a congressional appropriations rider prohibits the Department of Justice (DOJ) from spending federal funds to prosecute criminal defendants for marijuana-related offenses. After being indicted on charges of committing such offenses, Brian Bilodeau, Tyler Poland, and three companies associated with them claimed that their prosecutions ran afoul of the rider's prohibition. After the district court denied those claims, the defendants filed this appeal, arguing that the prosecutions should be halted.[1] For the following reasons, we disagree.

## I.

We begin by surveying the statutory and regulatory landscape governing the medical use of marijuana under Maine and federal law at the time of the relevant events. In 2009, Maine enacted the Maine Medical Use of Marijuana Act (the "Act"), Me. Rev. Stat. Ann. tit. 22, § 2421 et seq., which authorizes and circumscribes the use, distribution, possession, and cultivation of medical marijuana. Pursuant to the Act, Maine's Department of

---

[1] Independent of the other defendants, Bilodeau also argues on appeal that certain evidence seized in a search of his home and warehouse should have been excluded because the search violated his Fourth Amendment rights. For reasons detailed below, we decline to consider the merits of Bilodeau's separate contentions on appeal because we lack appellate jurisdiction to review now the ruling on the suppression motion.

Health and Human Services issued seventy-two pages of detailed regulations setting out numerous technical requirements for establishing compliance with the law. See 10-144-122 Me. Code R. §§ 1-11 (2013). Together, the Act and the corresponding regulations govern the medical use of marijuana in Maine.

During the time period covered by the operative indictment, the Act permitted only the "medical use"[2] of marijuana and then only subject to certain stringent conditions. Me. Rev. Stat. Ann. tit. 22, § 2422(5) (2016).[3] Under these conditions, a "[q]ualifying patient," id. § 2422(9), was permitted to "[d]esignate one primary caregiver . . . to cultivate marijuana for the medical use of the patient," Me. Rev. Stat. Ann. tit. 22, § 2423-A(1)(F) (2014). A primary caregiver was only authorized to assist a maximum of five qualifying patients. Id. § 2423-A(2)(C).

Primary caregivers could possess marijuana solely "for the purpose of assisting a qualifying patient" and then only in

_____

[2] At the time, Maine's definition of "medical use" encompassed "the acquisition, possession, cultivation, manufacture, use, delivery, transfer or transportation of marijuana or paraphernalia relating to the administration of marijuana to treat or alleviate a qualifying patient's debilitating medical condition or symptoms associated with the patient's debilitating medical condition." Me. Rev. Stat. Ann. tit. 22, § 2422(5) (2016).

[3] The following discussion of the Act and the operative regulations refers to those in effect from "about 2015" to February 27, 2018, when the events relevant to the indictment allegedly occurred.

- 4 -

certain quantities and forms.  Id. § 2423-A(2).  For instance, Maine law allowed a primary caregiver to possess up to six mature, flowering marijuana plants for each patient served.  See id. § 2423-A(2)(B); 10-144-122 Me. Code R. § 5.8.1.1.2 (2013).  For each patient, the primary caregiver could also have "up to 12 female nonflowering marijuana plants," 10-144-122 Me. Code R. § 5.8.1.2.1 (2013), which are plants above twelve inches in height or width that are not flowering.  There was no limit on the amount of "marijuana seedlings" a primary caregiver was permitted to possess, id., but a plant was only considered a seedling if it "ha[d] no flowers" and "[wa]s less than 12 inches in height and diameter," id. § 1.17.5.  A primary caregiver could also only possess "up to 2 1/2 ounces of prepared marijuana for each qualifying patient served." Id. § 5.8.1.1.1.; Me. Rev. Stat. Ann. tit. 22, § 2423-A(2)(A) (2014).

Primary caregivers who possessed excess prepared marijuana could transfer it to another caregiver or registered dispensary but only if nothing of value was provided to the primary caregiver in return.  See Me. Rev. Stat. Ann. tit. 22, § 2423-A(2)(H) (2014); 10-144-122 Me. Code R. § 2.8.2 (2013). Otherwise, a person who possessed marijuana or marijuana plants "in excess of the limits provided" had to "forfeit the excess amounts to a law enforcement officer."  Me. Rev. Stat. Ann. tit. 22, § 2423-A(7) (2014); 10-144-122 Me. Code R. § 2.9 (2013).

Primary caregivers were permitted to "[r]eceive reasonable monetary compensation for costs associated with assisting a qualifying patient." Me. Rev. Stat. Ann. tit. 22, § 2423-A(2)(D) (2014). And they could "[e]mploy one person to assist in performing the duties of the primary caregiver." Id. § 2423-A(2)(I). However, Maine law prohibited the formation of a "collective," id. § 2423-A(9), meaning "an association, cooperative, affiliation or group of primary caregivers who physically assist each other in the act of cultivation, processing or distribution of marijuana for medical use for the benefit of the members of the collective," id. § 2422(1-A).

While Maine state law permitted certain conduct relating to the medical use of marijuana, federal law, specifically the Controlled Substances Act (CSA), 21 U.S.C. § 801 et seq., did not. The CSA made it "unlawful for any person knowingly or intentionally to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense," id. § 841(a)(1), or simply to possess, id. § 844(a), a controlled substance such as marijuana, see id. § 802(6) (defining the term "controlled substance" by referring to drug schedules); id. § 812, sched. I(c)(10) (listing "marihuana" as a controlled substance). The CSA included no exception for medical marijuana and "designate[d] marijuana as

contraband for <u>any</u> purpose." <u>Gonzales</u> v. <u>Raich</u>, 545 U.S. 1, 27 (2005).[4]

Nevertheless, for each fiscal year since 2015, including over the time period of the defendants' prosecutions, Congress has attached a rider to its annual appropriations bill that states:

> None of the funds made available under this Act to the Department of Justice may be used, with respect to [Maine and other states], to prevent any of them from implementing their own laws that authorize the use, distribution, possession, or cultivation of medical marijuana.

Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, § 537, 133 Stat. 13, 138 (2019). Sometimes referred to as the "Rohrabacher-Farr Amendment" or the "Rohrabacher-Blumenauer Amendment," this appropriations rider places a practical limit on federal prosecutors' ability to enforce the CSA with respect to certain conduct involving medical marijuana.

## II.

We next consider the particular circumstances prompting this appeal. We accept the factual findings of the district court unless they are clearly erroneous. <u>See</u> <u>Jean</u> v. <u>Mass. State Police</u>, 492 F.3d 24, 26 (1st Cir. 2007); <u>see also</u> <u>United States</u> v.

---

[4] Federal law did permit a limited carve-out for the use of marijuana "as a part of a strictly controlled research project." <u>Raich</u>, 545 U.S. at 24. Of course, that is plainly not what is at issue here.

Parigian, 824 F.3d 5, 9 (1st Cir. 2016).  And we review the record in light of those findings.

As relevant to this appeal, the defendants owned or operated three sites used to grow marijuana in Auburn, Maine: (1) a property at 230 Merrow Road; (2) a property at 249 Merrow Road; and (3) a property at 586 Lewiston Junction Road (referred to as "Cascades").  The facility at 230 Merrow Road was a large warehouse containing multiple grow rooms that was largely operated by Bilodeau.  Bilodeau paid two caregivers, Danny Bellmore and Brandon Knutson, to tend to the marijuana growing at the site.  Bilodeau bought growing supplies for Bellmore and Knutson and picked up their prepared marijuana from the site.  Bellmore and Knutson displayed facially compliant paperwork and patient designation cards outside their grow rooms.  The warehouse at 230 Merrow Road was owned by defendant MR, LLC, an entity closely associated with Bilodeau.  Neither Bilodeau nor any other caregiver operating there had a lease agreement with MR.

The grow site at 249 Merrow Road was owned by defendant Ty Properties, LLC and operated by Tyler Poland.  249 Merrow Road consisted of multiple warehouses with offices and individual grow rooms.  Several caregivers were registered to operate the grow rooms and had lease agreements with Poland.  Like 230 Merrow Road, the 249 Merrow Road site had facially valid documents showing grows run by registered caregivers designated by qualified patients.

- 8 -

The Cascades facility was a warehouse with multiple individual grow rooms located at 586 Lewiston Junction Road. Cascades was owned by Kevin Dean, but Bilodeau was involved in its operation. Bilodeau was also registered as one of the caregivers at Cascades. Knutson, who worked for Bilodeau at the 230 Merrow Road site, was deployed by Bilodeau to Cascades on at least a few occasions.

For all three of the grow sites, the defendants and their associates procured and maintained paperwork from people claiming to be qualifying patients who designated Bilodeau, Poland, or one of their associates as their caregivers, which made the sites appear facially compliant with the Act's requirements. Indeed, after a scheduled visit on January 10, 2018, state inspectors found that the Cascades site was largely in compliance with Maine law.

Between 2016 and 2018, federal law enforcement officers began investigating Bilodeau and his association with a "drug organization" that "grows and distributes hundreds of pounds of marijuana per month under the cover of Maine's Medical Marijuana program." In the course of their investigation, federal agents surveilled Bilodeau and his associates, tapped their phones, and spoke with confidential sources.

On February 27, 2018, federal agents executed search warrants for Bilodeau's grow site at 230 Merrow Road, Poland's grow site at 249 Merrow Road, and Bilodeau's residence. Federal

agents seized significant quantities of marijuana at both grow sites. At 230 Merrow Road, agents recorded approximately 181 pounds of marijuana in plastic bags, along with 321 marijuana plants. At 249 Merrow Road, agents seized approximately 145 pounds of marijuana and 574 marijuana plants.[5] Agents also recovered from 249 Merrow Road several handwritten documents recording payments to marijuana "trimmers" and a notebook that documented marijuana sales from December 2016 to early February 2018. The notebook listed quantities of different types of marijuana, noted cash payments of more than $50,000, and used what appeared to be abbreviations for states such as "MD," "NY," and "GA" as headers.

Agents also found marijuana and marijuana concentrate at Bilodeau's home. A search of a safe room in the house revealed marijuana, a money-counting machine, a loaded handgun, and several documents. Some of the documents appeared to itemize sales (including a notation listing "$347,700" in "total sales"), costs associated with marijuana grows (including payments to trimmers to harvest marijuana), and amounts owed to different people (including sums for "Brian," "Kevin," and "Kev").

In due course, the government indicted the defendants and several others for, among other things, knowing and intentional

---

[5] Agents also seized alprazolam and MDMA from 249 Merrow Road.

- 10 -

manufacture and possession of marijuana with intent to distribute in violation of the CSA and conspiracy to do the same. See 21 U.S.C. § 841(a)(1). In response, the defendants moved to enjoin their prosecutions pursuant to the appropriations rider, arguing that the prosecutions were a prohibited use of federal funds to prevent Maine from implementing its medical marijuana laws. Bilodeau also moved to suppress the results of the search and requested a hearing under Franks v. Delaware, 438 U.S. 154 (1978).

After holding an evidentiary hearing, the district court concluded that prosecution of all counts of the indictment against each of the defendants could proceed. The district court reasoned that the defendants were not entitled to an injunction based on the appropriations rider because they were patently out of compliance with the Act, such that it was clear to the district court that Maine's marijuana laws did not authorize the sort of conduct evidenced at the hearing. In particular, the district court found that Bilodeau, Poland, and their associated LLCs did not engage in marijuana-related conduct for the purposes of assisting qualifying patients but instead were part of a "large-scale . . . black-market marijuana operation." The district court acknowledged that it was a "closer question" as to whether MR was entitled to relief under the appropriations rider. However, noting the "ample evidence" establishing that Dean (MR's sole member) and Bilodeau were "close associates" in their marijuana-related

- 11 -

activities, the district court held that MR had not shown "by a preponderance of evidence that it acted in strict compliance with Maine's medical marijuana laws."  The district court also denied Bilodeau's motion to suppress and his request for a Franks hearing. The defendants then filed these interlocutory appeals.

## III.

### A.

As an initial matter, we must consider our jurisdiction to hear these appeals.  Both the defendants and the government assert that we may exercise jurisdiction over the district court's denial of the defendants' motion to enjoin prosecution pursuant to 28 U.S.C. § 1292(a)(1).[6]  We agree.

Typically, appellate review must wait "until after conviction and imposition of [a] sentence." Midland Asphalt Corp. v. United States, 489 U.S. 794, 798 (1989).  Here, though, the alleged wrong is not the prosecution per se, but rather the use of federal funds in a manner that prevents the implementation of Maine's medical marijuana laws.  Absent an injunction, the funds will be spent and cannot be unspent.  In such circumstances, the defendants stand not so much as criminal defendants seeking to

---

[6] Although styled as motions to dismiss or to enjoin prosecution, the defendants' motions are in substance aimed at preventing the DOJ from spending federal funds to continue their prosecution.  These motions are best seen as requests for injunctions, so we refer to them henceforth solely as motions to enjoin prosecution.

vindicate a personal right but as parties with a particularly concrete interest in seeing a congressional spending ban vindicated. We can therefore safely treat the denial of their motion as outside the ordinary rule, United States v. McIntosh, 833 F.3d 1163, 1172-73 (9th Cir. 2016), or as a collateral order, Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546 (1949): It "conclusively determine[s] the disputed question," "resolve[s] an important issue completely separate from the merits of the action," and would "be effectively unreviewable on appeal from a final judgment." Midland Asphalt Corp., 489 U.S. at 798-99 (quoting Coopers & Lybrand v. Livesay, 437 U.S. 463, 468 (1978)).

As to Bilodeau's separate appeal of the denial of the motion to suppress and the request for a Franks hearing, we conclude otherwise for reasons explained in Part IV of this opinion.

**B.**

Our analysis of the merits of the spending challenge begins with the text of the appropriations rider. See Atl. Fish Spotters Ass'n v. Evans, 321 F.3d 220, 223-24 (1st Cir. 2003). The rider expressly forbids the DOJ from spending congressionally appropriated funds in a manner that "prevent[s]" a state such as Maine "from implementing [its] own laws that authorize the use, distribution, possession, or cultivation of medical marijuana." Consolidated Appropriations Act, 2019 § 537.

- 13 -

We can safely conclude that by "marijuana" the rider means the same substance described as "marihuana" in the CSA. See 21 U.S.C. § 802(16). And, although neither the rider nor the CSA defines it, we assume that the term "medical marijuana" means marijuana prescribed by a qualified medical care provider to treat a health condition. See Medical, Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/medical (last visited Oct. 20, 2021) (defining "medical" to mean "of, relating to, or concerned with physicians or the practice of medicine" or "requiring or devoted to medical treatment").[7]

The parties' arguments largely train on what Congress meant when it prohibited the DOJ from spending money to "prevent" a state "from implementing [its] own laws that authorize" medical marijuana activity. Consolidated Appropriations Act, 2019 § 537. To date, the Ninth Circuit is the only federal court of appeals to have interpreted the rider. Heeding Congress's choice of the word "implementing," the Ninth Circuit reasoned that the rider "prohibits DOJ from spending money on actions that prevent [states with medical marijuana laws from] giving practical effect to their

---

[7] The applicable Maine statute, at the time, limited the authorization of medical marijuana use to persons with debilitating medical conditions. We do not in this case confront a situation where a so-called "medical marijuana" authorization scheme in practice allows for recreational use, so we have no occasion to speculate about how the rider might or might not apply in those circumstances.

- 14 -

state laws that authorize the use, distribution, possession, or cultivation of medical marijuana." McIntosh, 833 F.3d at 1176. We agree with this reading of the rider and conclude, as the Ninth Circuit did, that the DOJ may not spend funds to bring prosecutions if doing so prevents a state from giving practical effect to its medical marijuana laws.

We turn next to deciding under what circumstances federal prosecution would prevent Maine from giving practical effect to the Act. Certainly, the prosecution of persons whose conduct fully complied with the Act and its associated regulations would prevent the law from having much practical effect. Such actions would render strict compliance with Maine's medical marijuana laws cause for conviction and imprisonment. This is precisely what the rider forbids. On this all parties agree.

The line the government would have us draw is between strict compliance and less-than-strict compliance. That is, it would have us rule that persons involved in growing or distributing medical marijuana are safe from federal prosecution only if they comply fully with every stricture imposed by Maine law. The government contends that the Ninth Circuit adopted this kind of strict-compliance test to differentiate between prosecutions that prevent a state's medical marijuana laws from having practical effect and those that do not. See id. at 1178; see also United States v. Evans, 929 F.3d 1073, 1076 (9th Cir. 2019) (stating

- 15 -

flatly that the court in <u>McIntosh</u> "stressed that defendants would not be able to enjoin their prosecutions unless they '<u>strictly complied</u> with all relevant conditions imposed by state law on the use, distribution, possession, and cultivation of medical marijuana.'" (quoting <u>McIntosh</u>, 833 F.3d at 1179)) (emphasis supplied by the <u>Evans</u> court). For two reasons, we find such a test inapplicable here.

First, if Congress had intended the rider to serve as a bar to spending federal funds on a prosecution only when the defendant was in strict compliance with state law, it would have been very easy for Congress to so state. By eschewing such an obvious, bright-line rule in favor of one that bars the use of federal funds to "prevent [a state] from implementing [its] own [medical marijuana] laws," Consolidated Appropriations Act, 2019 § 537, Congress likely had in mind a more nuanced scope of prohibition -- one that would consider the practical effect of a federal prosecution on the state's ability to implement its laws.

Second, the potential for technical noncompliance is real enough that no person through any reasonable effort could always assure strict compliance. For instance, a caregiver whose twelve nonflowering marijuana plants comported with the Act's limit immediately would have fallen out of compliance when just one of the caregiver's unlimited number of seedlings grew beyond twelve inches in height or diameter. <u>See</u> 10-144-122 Me. Code R.

§§ 1.17.5, 5.8.1.2 (2013).  And if the drying and curing process happened to yield more than 2 1/2 ounces of marijuana per qualifying patient, a caregiver would have been in violation of the Act until they disposed of the excess.  See id. § 5.8.1.1.1.; Me. Rev. Stat. Ann. tit. 22, § 2423-A(2)(A) (2014).  With federal prosecution hanging as a sword of Damocles, ready to drop on account of any noncompliance with Maine law, many potential participants in Maine's medical marijuana market would fasten fearful attention on that threat.  The predictable result would be fewer market entrants and higher costs flowing from the expansive efforts required to avoid even tiny, unintentional violations.  Maine, in turn, would feel pressure to water down its regulatory requirements to avoid increasing the risk of noncompliance by legitimate market participants.  Likely anticipating these concerns, the district court below appeared to acknowledge that "some sort of technical noncompliance" with Maine's regulations might be tolerated even under the strict compliance standard.

The government attempts to downplay these concerns by arguing that prosecutorial discretion and resource allocation can properly ensure that legitimate participants in Maine's medical marijuana market will not be subject to federal criminal prosecution.  But the point is not that caregivers acting in good faith will be prosecuted for even tiny infractions of state law but that they can be prosecuted.  The government's vague assurances

- 17 -

in this case will likely be cold comfort to anyone facing fears that imperfect compliance with the Act could lead to indictment and imprisonment.

It is true that requiring strict compliance with state law would not necessarily "prevent" the Act from having some practical effect. No matter the risks, there would likely be some participants in Maine's medical marijuana market. After all, there have always been participants in the market for unlawful drugs who are undeterred by even life sentences. But we do not think this is the kind of market that Maine sought to create when it enacted its medical marijuana laws. Because Maine limited the size of a primary caregiver's operations and restricts compensation to a "reasonable" amount, there do not appear to be great riches to be made in the medical marijuana market. A strict compliance approach would skew a potential participant's incentives against entering that market.

Strict compliance as construed by the government does have the benefit of identifying a bright line body of statutes, rules, and decisions that determine whether conduct violates state medical marijuana law and thus becomes subject to federal prosecution. See McIntosh, 883 F.3d at 1178 (looking to "those specific rules of state law that authorize the use, distribution, possession, or cultivation of medical marijuana"). But those rules were not drafted to mark the line between lawful activity and cause

for imprisonment. Rather, as with most every regulated market, Maine declined to mandate severe punishments (such as, for example, the loss of a license) on participants in the market for each and every infraction, no matter how small or unwitting. See, e.g., 10-144-122 Me. Code R. § 10.5.7 (2013) (providing that "[g]rounds for revocation of a registry identification card include . . . repeat forfeiture of excess marijuana" (emphasis added)). To turn each and every infraction into a basis for federal criminal prosecution would upend that decision in a manner likely to deter the degree of participation in Maine's market that the state seeks to achieve.

Although we reject the government's proposed strict compliance approach, we also decline to adopt the defendants' interpretations of the rider. Offering several slightly different formulations, the moving defendants and amicus argue that the rider must be read to preclude the DOJ, under most circumstances, from prosecuting persons who possess state licenses to partake in medical marijuana activity. These proposed formulations stretch the rider's language beyond its ordinary meaning. Congress surely did not intend for the rider to provide a safe harbor to all caregivers with facially valid documents without regard for blatantly illegitimate activity in which those caregivers may be engaged and which the state has itself identified as falling outside its medical marijuana regime.

Instead, we adopt an approach that falls between the parties' positions. In charting this middle course, we need not fully define its precise boundaries. The conduct that drew the government's attention was the defendants' cultivation, possession, and distribution of marijuana aimed at supplying persons whom no defendant ever thought were qualifying patients under Maine law. The record is clear that the posted patient cards and licenses, as well as the outward physical appearances of the grows, were facades for selling marijuana to unauthorized users.

Maine's medical marijuana regulations themselves expressly anticipated that a cardholder could be "convicted of selling, furnishing, or giving marijuana to a person who is not allowed to possess marijuana for medical purposes in accordance with [the rules promulgated under the Act]." 10-144-122 Me. Code R. § 10.5.1 (2013). Accordingly, convicting someone under 21 U.S.C. § 841(a)(1) who knowingly engages in such conduct would likely have no effect unwelcomed by Maine, much less prevent Maine's medical marijuana laws from having their intended practical effect.[8]

---

[8] In resting on the fact that the defendants have engaged in conduct for which Maine law expressly anticipates the possibility of a conviction, we need not reach the question of whether any other conduct that could serve as grounds for -- but does not in fact result in -- license revocation under Maine law can provide cause for the DOJ to spend funds prosecuting a licensee.

The record in this case amply supports the finding that the defendants were knowingly engaged in "a large-scale . . . black-market marijuana operation" aimed at supplying marijuana to persons known not to be qualifying patients. Bilodeau does not even offer a plausible narrative to the contrary in his briefs on appeal.

One defendant, MR, claims that it was a mere landlord that thought it was leasing space to legitimate medical marijuana caregivers. But as the district court found, MR's sole member, Kevin Dean, was up to his eyeballs in the actual substance of the marijuana distribution scheme. He was a close associate of Bilodeau, on whose ledgers were recorded various payments to "Kevin" and "Kev." Dean was himself registered to grow and partnered with Bilodeau to buy a marijuana trimming machine. Dean came up with no evidence that any of the marijuana that he grew or trimmed went to any qualifying patient. There is no evidence that MR charged anyone growing at 230 Merrow Road any rent on its premises, which was purchased with money loaned to Dean and Bilodeau.

As for Poland, he ran a grow site that provided no marijuana to medical marijuana patients and coordinated with Bilodeau to pay people who helped tend the illicit crop. Moreover, as the district court found, the record demonstrates that he oversaw the production and distribution of the grows at 249 Merrow

and likely supplied marijuana to out-of-state purchasers in bulk quantities.

Given these facts, we have no trouble concluding that the defendants have failed to establish that their pending prosecution under the CSA is in any way barred by the rider.

## C.

The defendants' last redoubt takes the form of a procedural challenge. They argue that we should not rely on the facts as found by the district court because the district court assigned them the burden of proof. Instead, they contend that the burden to demonstrate that a prosecution may proceed irrespective of the appropriations rider should lie with the government. We see no error in the district court's assessment that the defendants bear this burden. The issue here is not one of guilt or innocence in a criminal case. Rather, the defendants are requesting that we enjoin an otherwise plainly authorized government expenditure. We therefore see no reason to deviate from the normal rule that parties seeking injunctive relief bear the burden of proving entitlement to that relief. See, e.g., Munaf v. Geren, 553 U.S. 674, 690 (2008); Evans, 929 F.3d at 1077 (allocating the burden of proof to the defendants seeking to enjoin their prosecution pursuant to the rider because "the party seeking an injunction bears the burden of showing that he is entitled to such a remedy").

Accordingly, we agree that the appropriations rider does not bar the pending federal prosecution against the defendants.[9]

**IV.**

Bilodeau also raises two more traditional issues of criminal procedure -- a request for a Franks hearing and a motion to suppress. Bilodeau argues that the search-warrant affidavit for both his home and 230 Merrow Road was intentionally or recklessly misleading because it did not state that Bilodeau was a licensed marijuana caregiver who managed a grow site that passed inspection. And he argues that the government lacked probable cause to search his home in connection with any suspected criminal activity.

We normally do not review the denial of a criminal defendant's interlocutory motions prior to the entry of final judgment. See United States v. Cunningham, 113 F.3d 289, 295 (1st Cir. 1997). Bilodeau points to an exception sometimes referred to as "pendent appellate jurisdiction" that is applicable when (1) "the pendent issue is inextricably intertwined with the issue conferring the right of appeal" or (2) "review of the pendent issue

---

[9] Suffice it to say, nothing in this opinion suggests that fact-finding by the district court in this challenge to government spending will be preclusive or even admissible in any ensuing criminal trial. We affirm only that these prosecutions may proceed unimpeded by the rider; whether the defendants are guilty as charged beyond a reasonable doubt remains to be proven in ordinary course.

- 23 -

is essential to ensure meaningful review of the linchpin issue." Limone v. Condon, 372 F.3d 39, 50-51 (1st Cir. 2004); cf. Swint v. Chambers Cnty. Comm'n, 514 U.S. 35, 50-51 (1995) (leaving open the question of "whether or when it may be proper for a court of appeals, with jurisdiction over one ruling, to review, conjunctively, related rulings that are not themselves independently appealable"). He insists that the district court's suppression and Franks rulings are inextricably intertwined with the motion to enjoin because those rulings shaped the record considered by the district court in assessing the bona fides of his medical marijuana business.

Bilodeau's claim of intertwinement presumes that a finding in his favor on his motion to suppress evidence gathered pursuant to the challenged search would also bar use of that evidence in deciding whether the appropriations rider precludes his prosecution. Neither party cites any precedent directly bearing on this presumption. As the government points out, however, the exclusionary rule is rarely if ever applied outside the context of a criminal trial. Grand juries, for example, can consider evidence gathered in an illegal search. See United States v. Calandra, 414 U.S. 338, 350-52 (1974). The exclusionary rule embodies no "personal constitutional right," Stone v. Powell, 428 U.S. 465, 486 (1976); rather, it is employed to deter police overreaching by denying the government the ability to prove guilt

in a criminal proceeding, see Hudson v. Michigan, 547 U.S. 586, 591 (2006).  The rule serves as a "last resort, not our first impulse."  Id.

Here, the issue giving rise to appellate jurisdiction concerns the DOJ's compliance with a limitation in an appropriations bill.  We see nothing about the nature of such an issue that would require a court assessing that issue to close its eyes to otherwise competent evidence that even a grand jury could consider.  For that reason, resolution of Bilodeau's Fourth Amendment challenge to the search of his home and warehouse could have no effect on the resolution of the supposedly intertwined question raised in this appeal.  We therefore decline his request to entertain now his challenge to the district court's denial of his suppression motion and request for a Franks hearing.

**V.**

For the foregoing reasons, we affirm the denial of the defendants' motions to dismiss or enjoin their prosecutions and dismiss as premature Bilodeau's appeal of the denial of his motion to suppress and his request for a Franks hearing.

**- Concurring Opinion Follows -**

**BARRON**, **Circuit Judge**, concurring. I join the majority's opinion because I agree that, on this record, the federal prosecution of these defendants would not "prevent" Maine from "implementing" its laws permitting the sale and use of medical marijuana. See Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, § 537, 133 Stat. 13, 138 (2019). As the majority explains, the record "amply supports the finding" that the District Court made for the purpose of determining whether the federal rider applies that the defendants were engaged in an operation "aimed at supplying marijuana to persons known not to be qualifying patients." Maj. Op. 21. And, as the majority points out, Maine's own medical marijuana regulations expressly provide that when an individual "is convicted of selling, furnishing, or giving marijuana to a person who is not" a qualifying patient, that constitutes "[g]rounds for revocation" of that individual's license to grow and distribute medical marijuana. 10-144-122 Me. Code R. § 10.5.1 (2016); see also Me. Rev. Stat. tit. 22, § 2422(13) (2016).

True, Maine makes a "convict[ion]" for the conduct described above the ground for revoking a license to participate in the medical marijuana market. 10-144-122 Me. Code R. § 10.5.1 (2016). But, I am persuaded that a federal prosecution of conduct that Maine defines to be (when successfully prosecuted) conduct that warrants license revocation in no way "prevent[s]" the state

from "implementing" its own medical marijuana laws. Consolidated Appropriations Act, 2019 § 537. Cf. United States v. Evans, 929 F.3d 1073, 1077 (9th Cir. 2019) (looking "to the state law's substantive authorizations, not to the procedural rules that give practical effect to the state's medical-marijuana regime" to determine whether the rider bars federal prosecution).

I also agree with the majority's reasons for not applying the standard that the government asks us to apply here, which the government dubs a "strict compliance" standard. The appropriations rider, given its text and history, is hard to square with that standard, insofar as it would permit the federal prosecution of a defendant who holds a state-conferred license to participate in the medical marijuana market for conduct that could not lead under that state's law to the revocation of that license.

I do note, though, that although the government purports to borrow this "strict compliance" standard from the Ninth Circuit, it is not clear to me that the government is being faithful to the standard as the Ninth Circuit articulated it. The Ninth Circuit applied the standard bearing the "strict compliance" name in cases that involved a very different factual context from this one. None of the defendants in those cases had shown that they held a state-provided license to sell or use medical marijuana at the time of

their federal prosecutions.[10] Moreover, those cases turned on the strength of the defendants' showing that they would have been able to avail themselves of an affirmative defense to criminal prosecution under state law if they had been prosecuted in state court for the alleged involvement in the sale and use of medical marijuana that grounded their federal prosecutions.[11] Thus, it may well be that, once that difference in context is accounted for, the legal standard that we apply here pursuant to the federal appropriations rider is not materially different from the one that

---

[10] See, e.g., United States v. McIntosh, 833 F.3d 1163, 1169 (9th Cir. 2016) (describing various defendants including some defendants that "ran four marijuana stores" without discussing whether the state had formally licensed or otherwise sanctioned the defendants' conduct and remanding for an evidentiary hearing); United States v. Lynch, 903 F.3d 1061, 1075-78, 1086 (9th Cir. 2018) (explaining that the defendant "'does not dispute the government's assertion that he made no attempt to operate as a classic collective'" as permitted by a "California statute [] allowing medical marijuana collectives"); United States v. Evans, 929 F.3d 1073, 1078 (9th Cir. 2019) ("The district court found that Evans and Davis were not qualifying patients [under Washington law], and we agree. During the hearing, neither defendant introduced a 'green card' . . . and neither called a physician witness to testify to prescribing marijuana to Evans or Davis."); United States v. Gloor, 725 F. App'x 493, 495 (9th Cir. 2018) ("Gloor did not present the required paperwork upon request as required to satisfy the affirmative defense."); see also United States v. Trevino, 7 F.4th 414, 420 (6th Cir. 2021) (applying the Ninth Circuit's "strict compliance" standard in a case in which the defendant "'could never have been licensed' as a caregiver because he had a prior felony conviction" that disqualified him from such a license) (citing Mich. Comp. Laws § 333.26423(k)).

[11] See, e.g., Evans, 929 F.3d at 1076 (citing Wash. Rev. Code § 69.51A.043 (2013)); Gloor, 725 F. App'x at 495 (citing Wash. Rev. Code §§ 69.51A.085 (2012), 69.51A.040(2)-(4) (2008)); Trevino, 7 F.4th at 422-23 (citing Mich. Comp. Laws § 333.26428).

the Ninth Circuit applied, notwithstanding that the government's proposed "strict compliance" standard is untenable for all the reasons that the majority convincingly sets forth.